Good morning, Your Honors, and may it please the Court. Ben Patrick for Plaintiff and Appellant, MP Nexlevel. I'd like to reserve four minutes, if I may, for rebuttal. All right. The central question that the Court is presented with is, can a communications contractor install the components of a communications system? The district court answered that question in the negative. And in order to reach that conclusion, the district court read into the unambiguous C-7 license statute restrictions and limitations that appear nowhere on the face of that statute. In doing that, in going beyond the court's duty to give the plain meaning to the words that appear within the four corners of an unambiguous statute, the district court erred. And it's that error that we ask this Court to reverse. In aid of that error, the Court did at least three things independently that we can address. First, it redefined the term install in a way that is contrary both to how that term is used in the C-7 license and how that term is used elsewhere in the contractor's licensing statute. The Court concluded that inside the C-7 license, the word install must mean something to place something within a building or other fixed structure and not to place it outside in the ground, the way that MP-NEX level did. The problem with that definition of install is that the C-7 license explicitly anticipates the installation of satellite dish antennas, those are the words in the statute, which are obviously not installed inside buildings. And the C-7 license anticipates that a contractor will install low-voltage landscape lighting. And low-voltage landscape lighting is certainly not installed inside a building. And indeed, if you consider the example of low-voltage landscape lighting, you can see the central problem with the Court's reasoning. You have a lamp in your flower bed. It receives power from a cord. That cord must either sit on the ground or be buried underground. And if it's buried underground, then that means someone dug a hole, a trench. They placed that cable in that trench, filled it back up. That is exactly what MP-NEX level did with the conduit in question here. They dug a trench or bored a hole. They placed that conduit, essential for the conveying and protection of the fiber optic cable. And then they either covered the trench up or the conduit filled the hole. Your client did not connect the fiber optics, correct? Did not connect it and did not put it in there. You just put the tube in. You simply put in the conduit. That's absolutely right. And on, I think, Your Honor's point, CVIN makes the argument that you cannot be installing a communications system unless you install all of the components of the communications system. First of all, there is no limitation found that way in the C-7 license. But beyond that, we can go back to simply the language that you find in the C-7 license, telephone systems. No individual component of a telephone system, not the handset, not the line, not the poles, not the switchboards in AT&T's central office, are independently capable of communication. The system only works when all of the components are utilized in harmony to effectuate communications. And so the fiber optic cable by itself is not independently capable of communication. It needs to be tied into switchboards. Needs to be tied into light signaling devices. And in addition to that, it's not capable of being protected from damage without the conduit that MPNEC's level installed. And so, first of all, the definition of install, contrary to the very things that the C-7 license says that you can install. Second, the court, the district court, made explicit reference to the C-34 pipeline contractor statute in doing a compare and contrast between the two. The C-34 pipeline statute uses that same word, install, installs pipelines for the conveyance of fluid, water, gas, and petroleum. No one believes that that sort of pipeline is installed exclusively within homes. And so the meaning given to the word install by the court was explicitly, was patently contrary both to the sorts of things that the license anticipates that you would install and contrary to how that word was used in other license definitions that the court referred to and was aware of because the court used that C-34 pipeline contractor. Counsel, I hate to interrupt you because you're on a roll, but I've got a couple questions for you. First of all, let me ask you, do you agree that before we can make any decision, we have to establish that, in fact, there is jurisdiction? I think the court always has to have jurisdiction. I don't know that jurisdiction has been contested here. Well, but that's not necessary, is it? I mean, we can make that finding on our own. If there's no jurisdiction, we obviously have no basis for issuing a judgment. Now, so MP Next Level is a California corporation, right? I believe that that's correct, Your Honor. Okay. And it does a lot of construction in California, right? It certainly does a lot of construction in California and is licensed here. And it actually has three addresses for its home office, right? That's all correct, Your Honor. One in California, one in Minnesota, and one in Texas, right? I believe those all to be correct, Your Honor, that's correct. So where is the total diversity? And I can't remember, and I apologize for not having CVIN's place of incorporation at my fingertips. If I remember correctly, and I'll apologize to the court, I didn't anticipate this question and I would have studied up on it a little better. Part of the complaint was founded on a surety bond claim for payment and against, no, I'm sorry, I think that that's incorrect. So what's the court's question? In terms of whether or not there is a complete diversity of citizenship between the? Yes. Your Honor, I think that that was raised. I think that the issue of jurisdiction was raised on a Rule 12 motion below. I have to confess we're now talking about four, three or four years ago, but I think that this issue was addressed. I can't remember what the conclusion was, but I think that this was tested at the district court. And certainly the appellant rec — well, the record before the district court would reflect the contents of that Rule 12 motion. Okay. Thank you. Certainly. So in addition to the word install, another path that the district court took to this incorrect conclusion was that it, although the parties had agreed that the statute was unambiguous, made reference to extraneous interpretive materials in the form of that C-7 study guide. Now, I'll admit that, and it's certainly the case that, there are two California court of appeals cases, Pacific Cason and Romney 8s, where the court used the same set of materials. However — and it's on that basis that CVIN advocated that it was appropriate to do that, even though this was an unambiguous statute. The problem with that line of reasoning was, nowhere in the opinions for Pacific Cason or Romney 8s does the court address the propriety of using the study guide materials when the statute is unambiguous. It appears, from the face of those opinions, that that issue simply wasn't raised to those courts. In other words, no party did what MP Nexlevel did here before the district court raised their hand and said, wait, we object to the use of these extraneous materials when the statute is unambiguous. And so while we agree that the court used the guides in Pacific Cason and Romney 8s, those opinions don't stand for the proposition that they are appropriately used in the face of a challenge, in the face of a party saying this is an unambiguous statute, or the parties agree that it's an unambiguous statute. And that is the case here. Beyond that, it's one thing to use extraneous materials as interpretive aides to allow the court to interpret the words that exist in the statute. That is not how the study guide was used by the district court. The study guide was used, frankly, in derogation of the statute to add words to the statute that aren't there, to add limitations to the statute that aren't there. The approach that the district court took was, if a certain methodology of installation is not in the study guide, then it's not in the statute. Sotomayor, that's my question, though. I guess we haven't really addressed, I think, which is the second part of this statute, which is talking about work that is incidental and supplemental, too. So we've focused now on what installation means, but your client was hired to install this system, correct? Absolutely. And so, to me, you could avoid the details of what install means if whatever work you're doing is incidental and supplemental to fulfilling that contract. And the code says that work has to be essential to accomplish the work in which the contractor is classified. So I'd appreciate your comment on the connection or disconnection between install and then the supplemental and incidental language. The supplemental and incidental language is essentially a saving feature to say if a contractor, if some portion of a contractor's work might be argued to be outside the four corners of the license, which would mean outside the four corners of install because that word comes from the C-7 license. And so if there is a certain portion of the work that falls beyond the scope of the license, a contractor is nevertheless allowed to do that work so long as that work is incidental and supplemental, by which that we now know means essential to the accomplishment of work inside the scope. Where we would say we have work inside the scope, and I don't think that there's room for reasonable dispute on this, is the conduit that contains the fiber optic cable is clearly a portion of a communications system. And it's a necessary, integral, essential part of that system. The work that MP and Ex Level did that the district court found to be beyond the scope of this license, which was the boring and the trenching, that's essential to put that conduit in the ground. It has to get there somehow, and there's no other way to do it other than the ways that it was done. And as the... And so if you connect it to the installation of what your license is for, it wouldn't then permit you to go off and do other boring drilling, et cetera, correct? Not related. Unless it was related directly to the communications equipment. I would limit it even further than Your Honor's verbiage. It's not related directly to. It has to be essential to the installation of it. And it's that sort of carefully limited verbiage that saves us from instances like CVIN's question about, well, could you build a house in order to put a telephone system? Well, the house obviously serves many purposes, far beyond enclosing a telephone system. I would point out, under the facts, and the amicus before the Court developed some of these, just so that the Court understands, many of these things, the borehole, the trench, they cease to exist once the conduit is put in it. A trench is created. The conduit is placed. The trench is backfilled and paved. All of this were the — this was the work that the district court took issue with. But the trench, unlike the house, ceases to exist once the communications system is installed. Its sole purpose was to house that conduit, the conduit that was within the definition that the California Public Utility Code gives to the phrase telephone line, conduit that is definitionally part of a telephone line. And that's the other way that you understand that a contractor licensed to do all can also do some. The California Public Utility Code has, at Section 233, this definition of telephone line that includes all conduits, ducts, poles, and other appurtenances necessary to facilitate communication. So the California legislature is telling you, we view all of these pieces and parts as an integral whole of the telephone line, a communications system, to be installed by a communications contractor. The end result — I'm sorry, because you didn't notice, but you went past your four minutes, and I just wanted to bring it to your attention. Oh, I think that's got reason — that's fine. I'll reserve all of the rest of it. Thank you. Good morning, Your Honors. May it please the Court, my name is Bill Iliopoulos. I represent CVIN, the owner of this project. We're also the Respondent here today. I'm joined with Heather Hurd, who's one of my partners at our firm, who helped me with the briefing on this. But I'll be doing the argument today. Yes. Before you get started, can you help me out with regards to the jurisdiction issue? Was that, in fact, decided at the trial court level? Like Mr. Patrick, since it's been about a year, my recollection is fading on that issue, but my recollection is that MP Next Level of California is actually a Minnesota-based company, even though it's called California. So I'm not — I don't recall that it was a California resident, for sure. They did have some residents here, but it was a corporation, as I recall, that was created in Minnesota, under Minnesota law. So that's what I remember. I'm sorry. I don't remember — my memory's not better than that. CVIN is a group of small telecommunications companies in the Central Valley that sought to bring broadband Internet fiber to local schools, hospitals, and other public and private buildings throughout California's Central Valley. The whole project was about — just over 1,300 miles of broadband fiber networking, through 18 Central Valley counties. And there were 30 segments in total, although this motion only relates to the first nine of those segments, because the first nine of those segments were — the underground portion of the work was installed by MP Next Level when it had only its C7 license. Now — and all these nine segments — for all these nine segments, MP Next Level entered into the contract with — contracts, one for each segment, with CVIN when it had only the C7 license, no Class A or C34 license. Later — Did your client know that Next Level had a C7 license? No. In fact, the contracts, which were substantially identical, all required the bidding contractor here, MP Next Level, to have a general contractor's license. And when MP Next Level filled out its bid — You mean an A license? Huh? An A license? Well, it could be — it said general contractor's license. It could be an A license or, I suppose, a B license. Those are the two general contractor's licenses. When MP Next Level filled out the bid form, it listed its contract, California contractor's license. It turned out to be the C7, but we didn't know that. Can I ask you a question? Yes. Did your company bid these projects? No, we're the owner.  I see. Yeah, we were the owner. And MP Next Level was one of several bidders for the products, and they were selected to do the underground work. Did you get the fiber optics system installed? We eventually did get the fiber optics system installed. So just — By others. I mean, in other words, MP Next Level did the conduit, the underground work, for some — not the whole project, but a good portion of the project under their contracts. And then we had others install the fiber optic cabling that actually allows the transmission. So notwithstanding the fact that they might not have had the license that you say they should have, you got what you wanted. You got what you paid for, right? Yes and no. Or didn't pay for. Or didn't pay for, yeah. The reason this became a very — a lawsuit seeking substantial damages, both by them and our counterclaim against us, against them — us against them, is because we felt we didn't get what we paid for. We had substantial allegations, claims that they not only delayed the job, but incorrectly placed that conduit, and that a lot of the roadways under which they did the work and the public road right-of-ways ended up being deficient and had to be redone. So there were substantial claims that were never litigated because we didn't have to get to that point. May I ask you a question? Yes. On the contract where Next Level placed their contract number, contractor's license number, is there an ability on behalf of CVIN to call up the state contractor's license board and say, what kind of contractor's license does this number correspond to? Yes. Did you do that? No. Okay. Not to my knowledge. So you were — they were basically done with putting it in before you raised the license issue, is that right? Yes. License issue didn't even come up until the lawsuit started. Right. Okay. Let me — let's see. The facts in this case are undisputed, that the majority of MP's work for CVIN involved bearing conduit underground with work including underground trenching, horizontal directional drilling, excavation, compaction backfill of trenches, and pour-over, which is the repaving of the roadway sections that you've trenched or gone underneath where it had trenched. Most of the work was under public roadways and right-of-ways. A lot of that work was under Caltrans highways. Caltrans, as the district court pointed out, Caltrans has had and did have during this whole project a requirement that contractors doing horizontal directional boring work, for example, the type of work that was done here by MP, are supposed to have a — they have to have either a Class A license or a C-34 license. Did Caltrans ever red-tag this job and stop it? Not for that, but for other aspects, yes. But that's not an issue. That's not an issue in terms of what happened on the job, yes. Is it an issue here? So, no. So what does it matter is what I'm trying to understand. It's not dispositive, certainly. And the district court points that out. The district court does mention it. I think the district court thought that was interesting. I think what you're trying to do is just have Caltrans' requirement of a C-34 license or an A or a B license to be a sort of a Chevron interpretation of what the C-7 license is and that we should give deference to Caltrans. No, I don't think we should give any deference to it. I simply think it is relevant to show, because an important issue here is the technical nature and the sophisticated nature of the work that MP Next Level was contracted to do. This underground work is not like going with your little trenching shovel in your backyard and digging a little trench to put some underground cable in. Horizontal directional drilling, for example, involves, and this is in the record, involves a very large piece of sophisticated, hydraulically run equipment. You have to know at what angles to put the boring in. You have to know how far it's going to go, what kind of material you're going through. And so it's very complicated. And the district court pointed that out. The district court — in fact, the district court points out that we have, as part of our contracts with MP Next Level, we have very specific technical specifications to which MP Next Level had to comply for this underground trenching and boring and compaction. They had to meet these requirements. This is not going out in your backyard. Okay, but all of that begs the statutes. You know, so here's what the statute says. C-7 contractor can install, service, maintain all types of communication and low-voltage systems. And then it goes on to say what they could be. Is what they installed part of a communication system? Well, that's a yes or no answer, and then you can explain. I would say no. And why not? No. I would say that they can install a low-voltage communication system, but they can't install anything that's somehow related to a low-voltage communication system. That's what they say. And let me give you — Okay, let's stop right there. You're talking about low voltage, but it says all types of communication. All types of communication systems. Well, it's called — okay, the C-7 license, Reg 832.07, is titled low-voltage systems contractor. But it's communication systems with up to 91 volts, which is defined as low voltage. Do you believe there's an ambiguity in the C-7 statute? It's a very good question. You know, it's interesting that Mr. Patrick and MP say there's no finding of ambiguity, but let's talk about the word install and how the district court was wrong in that. I think the C-7 statute may be incomplete. And so to the extent there's an ambiguity, it's incomplete. And I think that's why the district court looked to the study guides. But let's figure that out. It says, is a fiber-optic system a low-voltage communication system? I thought both parties agreed it was. Fiber-optic system is a low-voltage communication system, yes. Okay, so it falls into C-7. There's no ambiguity about that, right? Right. Okay. Yeah. So if a fiber-optic system that we're talking about here falls under C-7, that would mean that a licensed contractor could install service and maintain it, correct? If it falls under C-7, then they could do it. You just told me that this fiber-optic system is a low-voltage communication system. The fiber-optic portion, it would be a low-voltage communication system. Okay. But you can't put the fiber-optics in the ground without conduit. You could do it a number of ways, actually. It's not just conduit. And that conduit, that conduit could be put in there. How would you protect it? What are you going to do? I mean, in fact, some of it wasn't done underground. Some of it's done above ground. You could just put it above ground in certain projects. Well, but that doesn't say it has to be above or below ground. It just says it's part of a system. So just so — The problem I'm having is it's like you're arguing all the things that could happen. But if the fiber-optic system is a part of a low-voltage communication system, then it's under C-7, right? Well, it's under C-7, but they can't — what we're saying is you have to look at the nature of the — the fact that it's low-voltage itself doesn't allow them to do everything. Just like — What does it allow them to do? It allows them, as the district court found, it allows them to install, you know, cable TV hookups in buildings. Where does it say that? I mean, it says it allows them to install, service, and maintain all types of communication in low-voltage systems, period. Right? So — and as the district court points out, if you allow — if you just read it like that and don't look at the study guides, if you don't look at the study guides for help — Right. — and you adopt MPNext-level's interpretation, which is that it's very broad, they can do anything that relates to a low-voltage communication system. And what — To installing a low-voltage. To install it. Right. To install. That's essential. So, as the district court points out, if you have — if you have — if you're going to have a satellite dish on top of a house, that would mean, since you have to install the house to get in that situation, you have to allow MPNext-level to install the house, because it's essential. That seems to me to be an absurd example, with all due respect to the district court, not — has nothing to do with it. I mean, that's a district court going out on a limb saying, well, you've got to build the house so you can put an antenna on top of it. You're not, at that point, installing the antenna. Let me think of — we mentioned another example. OK, have a — give me a better one. Not because we thought that example was absurd, but — Give me a better one. OK. A roofing contractor has a specialty license to install a roof. It does not allow the roofing contractor to do the underground, the foundation, the house, which involve — or other structure which involves structural components. Just because they're licensed to install the roof doesn't mean they're licensed to install everything under the roof. Still a bad example. Another example. It's still a bad example. Another example. It's not analogous. Give me another one. Sutro Tower. Suppose Sutro Tower — let's just assume for a second it had low voltage. I think it does, but low-voltage systems, OK? If it has low-voltage systems, you see — you know how — the Court knows how tall Sutro Tower — did you want Larry the cable guy or a cable contractor constructing Sutro Tower because there's satellite antennas up there? That's the house example turned into Sutro Tower. It doesn't change anything. So what I'm having trouble with is everybody's going into the manuals and all this. I'm reading what the — what the regulation says, and then it goes on, basically, that permits you to install anything that's essential, you know, as ancillary, in effect. And that takes you out of doing pipeline construction and all the other examples that were given. So why, for example, wouldn't this be incidental and supplemental to installing this fiber optic cable? Because here, they didn't even install the fiber optic cable. So what they did — you would have to argue that really everything they did was somehow incidental and supplemental to what they were licensed to do. They didn't install the fiber optic cabling. They did all this underground work. So to find that what they did was incidental and supplemental — Well, why do you say they didn't install anything? They installed the underground work. Sure. They didn't install the fiber optic low-voltage equipment. But this is — you need — isn't that an essential part of having the equipment to work? So if — I mean, answer my question first, not if it — Okay. Isn't having this conduit essential to being able to have the fiber optic function? In this circumstance? Yes. Okay. Yeah. And that's what the specifications provided. They said put it in the ground. They didn't say take it upstairs. Well, yes. In some cases, most — what we're talking about is the underground part. There were some parts where it was above ground, too. What I'm saying is, if we — if the Court is to interpret incidental and supplemental to mean that the contractor can do anything, that's essential. I mean, it's going to swallow up the rule. Incidental and — let's remember, incidental and supplemental means what it says. It's a piece of — so it comes into play when there is a — when there is — when you have in-scope work that you're licensed to do, and then there's a little bit, an incidental and supplemental portion that you're not licensed to do, that you can do it. It's not just saying — it's not just everything that's essential. You can do anything that's essential, even though it's outside. That's my point. That's what I'm trying to say. Thank you. Okay. Well, you've used up a couple more minutes of your time. Your clock is off, sir. It was already down two minutes, so you've used all your time. Okay. Have I used all my time? Thank you. Thank you. Plus a little extra, just so you know. Well, let me come back to your Honor's question. And absolutely, I think that my opposing counsel had this exactly right. I believe, and I believe that this is what the complaint will say, that MP Next Level of California is a Minnesota corporation. I'm looking back at their jurisdictional statement on our brief. We indicate a Minnesota — That's not the test, though, is it? I'm sorry, say that again? That's not the test, though, is it? The question is, where's the nerve center of the corporation? And I think what you'll see that the complaint alleged is that the headquarters is in Minnesota, and it's a run-out of Minnesota. Not that it doesn't do business in California. That's fine. But that. I think just taking this essential-to-do-the-work issue, CVIN's quibble, their complaint, is with what the statute says. Because the incidental and supplemental statute says exactly what CVIN says it can't say, that you can do anything that is essential to the accomplishment of work. That's literally the statutory definition of incidental and supplemental. And it may be that CVIN takes issue with that. But that is not for the court to rewrite, just like it is not for the court to rewrite the definition of the C-7 license, which was what the district court did, which was the error that brings us here. Thank you very much. Thank you, Your Honors. Thank you both for your briefing and for the argument. The case just argued, MT next level versus CVIN is submitted. And we're adjourned for the morning. Thank you.
judges: McKeown, Bea, Benitez